**IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CENTRAK, INC., | |
| *Plaintiff,* | |
| v. | CASE NO. 2:25-cv-03478 |
| COMMURE, INC., *et al.* | |
| *Defendants.* | |

**AMENDED COMPLAINT**

Plaintiff, CenTrak, Inc. ("CenTrak" or "Plaintiff"), by and through its undersigned

counsel, files this Amended Complaint seeking a preliminary injunction and damages against its

former employees, Peter Rodrigues, Todd Stewart, Christine Sei, and Anthony Fierro (the,

"Former Employees"), and their current employer, Commure. Inc. ("Commure") (collectively,

the "Defendants"), and states in support thereof:

I.    **INTRODUCTION**

1.    CenTrak asserts claims for breaches of restrictive covenants against the Former

Employees[1], and for interference with contractual relationships against Commure.

2.    CenTrak also asserts claims against all Defendants for their collective

misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

1836, and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S.A. § 5301, *et seq.*

---

[1] CenTrak has since been advised that Todd Stewart and Pete Rodrigues have been terminated from their positions with Commure. However, while the termination of their employment may alleviate concerns about illegal conduct moving forward, it does nothing to cure the damage caused by their improper conduct prior to leaving Commure's employ.

## II.    JURISDICTION AND VENUE

3.      This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 because this is a civil action involving claims arising under the laws of the United States, including the DTSA, and all other claims are so related to the claim within the Court's original jurisdiction that they form part of the same case or controversy.

4.      Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because the claims pled herein arose in this district, and Former Employees consented to venue and jurisdiction in Bucks County, Pennsylvania, pursuant to the employment agreements at issue in this case.

5.      Indeed, as detailed below, Defendants intentionally engaged in conduct aimed at harming CenTrak, a Pennsylvania company.

6.      Their tortious actions – some committed within Pennsylvania and others outside the state – were purposefully aimed at causing significant injury to CenTrak's business in the Commonwealth, and their actions have had significant impact within this forum.

## III.    PARTIES

7.      CenTrak is a Delaware corporation with its principal place of business at 826 Newtown Yardley Road, Newtown, PA 18940.

8.      CenTrak develops and sells a suite of Real-Time Location Services and environmental monitoring solutions used in healthcare environments.

9.      Its RTLS offerings cover the following:

- Asset – tracking the exact location of tagged mobile medical equipment;

- Safety – providing security solutions for infant protection, staff duress, wander management, and wireless emergency calls;

- Workflow – analyzing trends to identify bottlenecks in patient care, eliminate non-value-added tasks, and automate documentation of clinical milestones for improved operations;

- Infection control – eliminating manual documentation and compliance reporting to enhance operational efficiencies and support greater staff and patient safety;

- Experience – a robust mapping and wayfinding platform that integrates with Patient Engagement platforms to display staff presence;

- Environment – automatically recording temperatures, humidity levels, and differential air pressure.

10.    Commure is a Delaware corporation with its principal place of business at 160 South Whisman Road, Mountain View, California 94041.

11.    According to its website, Commure "develop[s] cutting-edge technology with leading health systems to simplify every step in the delivery of healthcare." *See* Commure "Company" Webpage, ([www.commure.com/company](www.commure.com/company))  (accessed on June 6, 2025).

12.    Amongst its offerings is "Strongline EVP" ("Strongline"), an RTLS product that assists with:

- Staff Safety – "Protect staff with wearable duress badges; indoor, outdoor, at home."

- Assets Management – "Track location and optimize utilization of your devices."

- Patient Elopement – "Follow patients through the care journey."

*See* Commure "Strongline" Webpage ([www.commure.com/strongline-evp#product-content](www.commure.com/strongline-evp#product-content)) (accessed June 6, 2025).

13.     Defendant, Peter Rodrigues ("Rodrigues"), is an adult individual who, on information and belief, has residences at 1569 Lorraine Drive, Encinitas, California, 92024 and 113 Coolview Drive, Seneca, South Carolina 29672.[2]

14.     Rodrigues is a former Vice President of Sales at CenTrak, who signed a valid Employee Confidentiality, Non-Competition, and Assignment of Invention Agreement ("Agreement") with CenTrak on or about December 21, 2015.

15.     His employment with CenTrak ended on or about September 30, 2024.

16.     Rodrigues now directly competes with CenTrak as a Commure employee in violation of his Employment Agreement.

17.     Defendant, Todd Stewart ("Stewart"), is an adult individual who, on information and belief, resides at 496 Sweetgum Lane, Palm Coast, Florida 32137.

18.     Stewart is a former Vice President of Solution Sales at CenTrak, who signed an Agreement on or about January 29, 2020.

19.     His employment with CenTrak ended on or about September 27, 2024.

20.     Stewart now directly competes with CenTrak as a Commure employee in violation of his Employment Agreement.

21.     Defendant, Christine Sei ("Sei"), is an adult individual who, on information and belief, resides at 6989 Turner Road, Frisco, Texas 75036.

22.     Sei is a former Vice President of Sales Operations at CenTrak, who signed an Agreement on or about March 1, 2021.

---

[2] Upon information and belief, Rodrigues does not consider himself a California resident, as he has requested written documentation from CenTrak that would prove he was a South Carolina resident so that he could take advantage of in-state tuition discounts at South Carolina colleges for his children.

23.     Her employment with CenTrak ended on or about January 7, 2025.

24.     Sei now directly competes with CenTrak as a Commure employee in violation of her Employment Agreement.

25.     Defendant, Anthony Fierro ("Fierro"), is an adult individual who, on information and belief, resides at 500 South Vine Street, Denver, Colorado 80209.

26.     Fierro a former Director of Strategic Accounts at CenTrak, who managed some of CenTrak's largest customers.

27.     Fierro's employment with CenTrak ended on or about January 24, 2025.

28.     Despite claiming he was joining Commure's "Scribe" division, Fierro has been seen publicly representing himself as Enterprise Sales Director, Strongline at a trade show after his departure.

29.     It has thus become clear to CenTrak that Fierro directly competes with CenTrak as a Commure employee in violation of his Employment Agreement.

**IV.     FACTUAL BACKGROUND**

    **A.  The Former Employees' Duties to CenTrak Under Their Employment Agreements**

30.     In exchange for their continued employment at CenTrak, each of the Former Employees signed an Employee Confidentiality, Non-Competition, and Assignment of Invention Agreement ("Agreement"), which required them to protect CenTrak's confidential information and prohibited them, for one year following the termination of their employment with CenTrak, from:

- Directly or indirectly competing with the business of CenTrak;

- Soliciting any current or prospective customers of CenTrak; and

- Soliciting any employees or agents of CenTrak.

5

31.     Stewart and Fierro signed agreements with the same terms that begin by acknowledging that the Former Employees' positions exposed them to "certain confidential, competitively sensitive and proprietary information of CenTrak", which "is a valuable, special and unique asset of CenTrak" requiring protection. *See* true and correct copies of the Stewart, and Fierro Employment Agreements, attached collectively hereto as Exhibit "A", at § 2.1.

32.     Because of this, the Former Employees explicitly agreed to not "directly or indirectly, during or at any time after Employee's employment with CenTrak, use Confidential Information or any part of such Confidential Information for Employee's benefit or the benefit of any person, business or entity or disclose Confidential Information or any part of such Confidential Information to any person, business, or entity for any reason or purpose whatsoever…." *Id.*

33.     Section 2 of their Agreement also created three separate restrictive covenants related to the Former Employees' work at CenTrak:

> 2.2 Non-Solicitation of Employees and Agents. During the term of this Agreement and for a period of one (1) year after Employee's employment with CenTrak is terminated by either party for any reason or no reason, Employee shall not, directly or indirectly, solicit, encourage or induce or attempt to solicit, encourage or induce, any person who provides services to CenTrak, whether as an employee, consultant, independent contractor or agent, or any entity which provides services to CenTrak under an agency relationship to terminate his, her or its relationship with or services for CenTrak, and shall not, directly or indirectly, either individually or as owner, agent, employee, consultant or otherwise, employ or offer employment to any person, agent or entity that provided services to CenTrak unless such person, agent or entity shall have ceased to provide services to CenTrak, or to have had a legal relationship with CenTrak for a period of at least six (6) months.
>
> 2.3. Non-Solicitation of Customers and Prospective Customers. During the term of this Agreement and for a period of one (1) year after Employee's employment with CenTrak is terminated by either party for any reason or no reason, Employee will not, directly or

indirectly solicit, contact, or do business with or attempt to solicit or do business with any customer or prospective customer of CenTrak, with respect to activities which compete in whole or in part with the activities of CenTrak. For purposes of this Agreement, "customer" includes any person, business, or entity: (i) that Employee contacted, solicited, or in any way dealt with at any time within the twelve (12) month period immediately preceding Employee's termination of employment with CenTrak for the purpose of soliciting the sale of goods and/or services of CenTrak; (ii) any person, business, or entity for whom Employee had any direct or indirect responsibility at any time within the twelve (12) month period immediately preceding Employee's termination of employment with CenTrak; and (iii) any person, business, or entity with whom CenTrak, with Employee's direct or indirect participation, had made contact and provided a quote or proposal or had been asked to provide a quote or proposal within the twelve (12) month period immediately preceding Employee's termination of employment with CenTrak.

2.4 Non-Competition. During the term of this Agreement and for a period of one (1) year after Employee's employment with CenTrak is terminated for any reason, voluntarily or involuntarily, Employee shall not directly or indirectly on behalf of Employee or any other person, business or entity, compete with CenTrak in the Territory. For purposes of this Agreement, "compete" means participating in the discovery, reduction to practice, manufacture, management, planning, research, development, or sale of real time locating technology and/or environmental monitoring (including without limitation the monitoring and/or control of temperature, humidity and other environmental conditions) infant, child or adult wander prevention, emergency alert, and/or senior care. For purposes of this Agreement, "Territory" means the United States, and any geographic areas outside of the United States serviced by Employee during the three (3) year period immediately preceding Employee's termination of employment with CenTrak.

*See* Exh. B, at § 2.

34.    Section 6 of the Employment Agreement then provides the remedies for any

breach of the restrictions in Section 2, stating:

Employee acknowledges that breach of Sections 2 and/or 3 of this Agreement by Employee will cause CenTrak substantial and irreparable harm, which may not be adequately compensated by damages. In the event of Employee's actual or threatened breach of the provisions of any or all of the terms of this Agreement, CenTrak

shall be entitled to obtain equitable relief, including an order requiring Employee to take any affirmative action necessary to effectuate the terms of this Agreement, and enjoining Employee from committing such actual or threatened breach of this Agreement. Employee agrees and acknowledges that CenTrak is entitled to equitable relief without posting a bond. In addition to these equitable remedies, CenTrak shall also be entitled to recover from Employee all of its legal remedies along with any reasonable attorney's fees, expenses and costs CenTrak incurs in connection with Employee's breach or threatened breach of this Agreement.

*Id.* at § 6.

35.     Lastly, Section 9 of the Agreement provides that, "[w]ith respect to any disputes under th[e] Agreement, the parties submit to the venue and exclusive jurisdiction of the Commonwealth and federal courts in Bucks County, Pennsylvania, and waive any claims as to forum non-convenience with respect to such courts." *Id.* at § 9.

36.     Rodrigues' and Sei's[3] Agreements differ slightly from the other Former Employees in form, but not in any way material to the instant action. *See* true and correct copy of Rodrigues' Agreement, attached hereto as Exhibit "B" and Sei's Agreement, attached hereto as Exhibit "C".

37.     Rodrigues' agreement acknowledges that his "employment by [CenTrak] creates a relationship of confidence and trust with respect to any information of a confidential nature that may be disclosed to [him] by [CenTrak] that relates to the business of [CenTrak] (such as Inventions, marketing plans, product plans, business strategies, financial information, personnel information and customer lists), or its affiliates, customers or suppliers…." *See* Exh. B, at § 5.

---

[3] In its original Complaint, CenTrak had pulled the standard Employee Confidentiality, Non-Competition and Assignment of Invention Agreement typically signed by its employees during onboarding. In their Motion to Dismiss, Defendants pointed out that Sei's operative agreement was a separate agreement signed a day earlier. CenTrak has since confirmed this fact and now attaches the correct copy of Sei's Agreement as Exhibit C to the Amended Complaint.

38.     Given the sensitive nature of this information, Rodrigues agreed that, "both during [his] employment and after its termination, [he] will keep and hold all such Proprietary Information in strict confidence and trust, and [he] will not use or disclose any of such Proprietary Information without the prior written consent of [CenTrak], except as may be necessary to perform [his] duties as an employee of [CenTrak] for the benefit of [CenTrak]." *Id.* at § 7.

39.     Rodrigues' Agreement went on to establish restrictive covenants giving him a duty not to compete with CenTrak, not to solicit any of CenTrak's employees or strategic partners, and not to interfere with any business opportunities that arise in CenTrak's favor for a period of one year after the termination of his employment with the company:

### 9. **Duty Not to Compete**

(a)     During [Rodrigues'] employment at the Company and for a period of one (1) year after the termination of that employment, [he] will not, without the Company's express written consent, directly or indirectly engage in any consulting, employment with one of the Listed Competitors (as defined in Schedule B) or any other business that is "competitive" with the Company or assist others in any business that is "competitive" with the Company. A company shall be considered "competitive" with the Company if such company engages in the Business.

(b)     [Rodrigues] and the Company agree that the scope of the obligations contained in Section 9(a) of this Agreement are reasonable. However, should a court of competent jurisdiction ever find any of the provisions of Section 9(a) to be invalid or unenforceable, [Rodrigues] and the Company agree that such provisions shall be enforced to the fullest extent permitted by law. If the provision found to be invalid or unenforceable cannot be enforced as written, [Rodrigues] and the Company agree that the provision shall be read to provide the Company with the greatest protection of its legitimate business interests permitted by applicable law.

### 10. <u>Non-Solicitation/Non-Interference</u>

(a)    During my employment at the Company and for a period of one (1) year after the termination of that employment. Regardless of the reason for such termination, [Rodrigues] agree[s] that [he] will not:

(i) recruit, solicit, hire, or assist others in recruiting, soliciting or hiring, any past or present members, director, employee, contractor or other business associated (collectively each a "Business Relation") or otherwise induce any Business Relation to terminate or cease his/her employment or other business relationship with the Company. The term Business Relation shall include those individuals or entities who were employed, engaged or associated with the Company during [Rodrigues'] employment, but shall not include any individual who has not had any business relationship with the Company for a period of six consecutive months at the time of the recruiting, solicitation or hiring.

(ii) solicit, divert, or take away, or attempt to solicit, divert or take away the business or patronage or any of the clients, customers, business contacts or accounts, or prospective clients, customers or accounts of the Company which are or were contacted, solicited, or served by the Company. For purposes of this agreement the term "prospective client, customer or accounts" shall include those individuals and/or entities with which the Company has had contact.

(b)    [Rodrigues] understand[s] and agree[s] that situations may arise in the future that require [CenTrak] to let [Rodrigues'] future employers know about [his] responsibilities under this Agreement and hereby authorize the Company to disclose the existence of the restrictions contained in this Agreement to all third parties the Company deems appropriate to protect its legitimate business interests.

*Id.* at §§ 9-10.

40.    Similarly, Sei likewise acknowledged that her "position with CenTrak [would] expose [her] to certain confidential, competitively sensitive and proprietary information of CenTrak …" and she specifically agreed that she would not, "directly or indirectly, during or at any time after [her] employment with CenTrak, use Confidential Information or any part of such

Confidential Information for … the benefit of any person, business or entity for any reason or purpose whatsoever, except upon the prior written consent of CenTrak." Exh. C, at § 2.1.

41.     Section 2.3 of Sei's agreement took things even further, however, expressly stating that, "[d]uring the term of th[e] Agreement and for a period of one (1) year after Employee's employment with CenTrak is terminated by either party for any reason or no reason, Employee will not, directly or indirectly, solicit, contact, or do business with or attempt to solicit or do business with any customer or prospective customer of CenTrak, with respect to activities which compete in whole or in part with the activities of CenTrak." *Id.* at § 2.3.

42.     The following section of the agreement provided that same protection to CenTrak, but in the form of a non-compete that precludes Sei, for a period of one year following termination, from "participating in the manufacture of real time locating technology and/or environmental monitoring (including without limitation the monitoring and/or control of temperature, humidity and other environmental conditions) infant, child or adult wander prevention, emergency alert, and/or senior care." *Id.* at § 2.4

43.     Despite these carefully laid out protections set forth by CenTrak, however, the Former Employees, on behalf of Commure and with Commure's aide and encouragement, have breached their Agreements by directly competing with CenTrak's RTLS offerings through the promotion of Commure's Strongline service instead.

44.     Even worse, they are using their deep proprietary knowledge of CenTrak's RTLS platform, including sales strategies, pain points, and key differentiators, their knowledge of CenTrak's key customer contacts, renewal timelines, pricing, and customer dissatisfaction issues, and their understanding of and relationships with CenTrak's strategic distribution and technology

partners, in an attempt at poaching CenTrak's key customers and strategic partners away from RTLS and towards Strongline.

45.    Accordingly, pursuant to Sections 2, 6, and 9 of the Agreements, CenTrak requests that this Court grant it the necessary injunctive relief to enforce them, along with any other legal and equitable relief the Court deems just.

**B.    The Former Employees' Resignations, Deceptions and Breaches of the Agreements**

**(i)    The Former Employees' Departure From CenTrak**

46.    Between late August and the end of 2024, three key CenTrak employees – Rodrigues, Stewart, and Sei – resigned from their positions at CenTrak and left the company.

47.    Each of them had significant experience and responsibility related to CenTrak's RTLS product line, which is central to CenTrak's business success.

48.    At the time of their departures, there was no clear indication that any of them intended to join a competitor or otherwise breach their Agreements.

49.    Rodrigues' last day was September 30, 2025, and he explained that he was leaving the company because he was fatigued by the challenges CenTrak was facing and wanted to pursue an opportunity outside of RTLS; specifically, one involving private equity.

50.    Stewart's last day was September 27, 2024, and when he was asked about his future plans he vaguely stated he was considering consulting and had no specific direction at the time.

51.    Sei resigned in mid-November 2024, and when asked where she was going, she refused to disclose her new employer, but assured CenTrak that she would not be competing in the RTLS market.

52.     Each of the Former Employee's future career plans were discussed with Chief Commercial Officer, Crystal Ryan, when they gave their notice of resignation.

53.     Based on the consistency of their stories and the broader organizational leadership changes at the time, which caused some increased turnover of employees, CenTrak did not have concerns about potential violations of the Agreements.

54.     It later became clear to CenTrak through rumors passed around in the market that Rodrigues, Stewart, and Sei had all joined Commure, a company that operates, among other things, the competing RTLS product line, Strongline.

55.     However, when Ms. Ryan confronted Rodrigues about this at the end of 2024, Rodrigues admitted to telling Stewart and Sei he was interviewing at Commure but explicitly denied any solicitation of the others to join him.

56.     Moreover, Rodrigues made it abundantly clear that neither he nor Stewart nor Sei would be working on Strongline; claiming, instead, that they would be working on Commure's other offerings.

57.     Based on the information available at the time, and the representations made by Rodrigues, Stewart, and Sei, CenTrak had no reason to believe there was an active threat to its customer relationships and business interests.

**(ii)     Early Warnings and Cease-and-Desist Letters: January 2025**

58.     However, CenTrak's subsequent investigation into the matter revealed that the Former Employees' intentions, as directed and rewarded by Commure, were far more sinister.

59.     When Rodrigues arrived at Commure towards the end of 2024, he boldly declared to its workforce that he "knows where the bodies are buried in CenTrak," and that Commure,

through Rodrigues, Stewart, and Sei, could easily take advantage of that information by targeting the CenTrak customers that would be easiest to sway away from its offerings.

60.     The Former Employees then worked quickly to fulfill Rodrigues' stated promise, and starting in January, Rodrigues and Stewart began actively working to build up sales of Commure's Strongline product in direct violation of their non-compete agreements.

61.     When CenTrak got word of this improper conduct, it issued cease-and-desist letters to Commure, Rodrigues, Stewart, and Sei on or around January 7, 2025, reminding them of their obligations under the Agreement. *See* true and correct copies of the January 7, 2025, letters, attached hereto as Exhibit "D".

62.     That same month, Fierro resigned from CenTrak, and he admitted he was going to work for Rodrigues at Commure.

63.     Fierro explicitly denied any intent to work on Strongline products and said he would not be competing with CenTrak in any way.

64.     despite the fact that Rodrigues was hired by Commure due to his knowledge of, "where the bodies are buried," and the Former Employees were hired to take advantage of Rodrigues' knowledge by targeting the troubled CenTrak customer accounts with which they had prior relationships.

65.     Despite Fierro's assurances, CenTrak still issued a cease-and-desist letter to him on his last day of employment, January 24, 2025, along with a letter to Commure copying the other Former Employees. *See* true and correct copies of the January 24, 2025, letters, attached hereto as Exhibit "E".

66.     As it later became clear, CenTrak was correct in issuing the additional letter because the Former Employees were hired by Commure based on Rodrigues' knowledge of,

"where the bodies are buried" at CenTrak, so they could leverage this knowledge to target CenTrak customers with whom they had developed relationships.

      **(iii)**     **Escalation of Misconduct Into Explicit and Active Competition**

67.     By March and April of 2025, the situation had begun to rapidly deteriorate, and CenTrak had become seriously concerned about suffering commercial harm.

68.     Key accounts formerly serviced by the Former Employees suddenly started to warn CenTrak that they were going to migrate away from its offerings, and CenTrak heard that several of its clients had been approached by Rodrigues and Stewart on behalf of Commure/Strongline.

69.     More troubling, Fierro was observed at a healthcare trade show openly representing himself as a sales director in Commure's Strongline division and attempting to market that competitive product.

70.     It has now become clear that the Former Employees' prior narrative that they were working in separate, non-competitive divisions was false, and they are instead assisting Commure in actively competing against CenTrak's offerings in direct violation of the terms of the Agreement. Even worse, they appear to be doing so by targeting the very same accounts they previously serviced at CenTrak.

71.     CenTrak's RTLS technology is at the core of its product offerings. It allows for precise in-room tracking of staff and assets for hospital facilities, with its primary use being a panic button for staff safety.

72.     CenTrak was already in the market prior to the launch of Commure's Strongline product, and it offers a broader suite of features that Strongline lacks.

73.     However, the Former Employees have misappropriated CenTrak's deep, sensitive, commercial knowledge to assist Commure in competing in the market in direct violation of the Agreement.

74.     The information at issue includes, but is not limited to:

    a.  CenTrak's most vulnerable accounts;

    b.  Sales timing and renewal cycles;

    c.  Quality control issues affecting certain clients;

    d.  Strategic partner relationships and distributor preferences;

    e.  The pricing models and sales strategies used by CenTrak;

    f.  Programs software;

    g.  Engineering data;

    h.  Financial data;

    i.  Employee Identity Lists;

    j.  Customer Identity Lists;

    k.  Potential Customer Identity Lists;

    l.  Customer Requirements and Specifications Received from Customers Themselves; and

    m.  Other Related Business Plans and Projections.

(the "Confidential Information").

75.     CenTrak takes reasonable steps to maintain the secrecy of the Confidential Information by, among other things, limiting its disclosure to only those employees who need such information to complete their job duties, securing the information within computer systems and storage devices that are password protected and kept under stringent control, requiring all its

employees to sign confidentiality and non-disclosure agreements, and pursuing litigation such as the instant case where necessary to stop the Confidential Information's improper disclosure.

76.     However, the Former Employees have intimate familiarity with such information, and as their actions have shown since leaving CenTrak, they are following Commure's direction in utilizing the Confidential Information to Commure's benefit and CenTrak's detriment.

77.     Specifically, the Former Employees have extensive knowledge of CenTrak's customer base and internal pain points, which would give Commure an enormous competitive advantage in attracting new customers in the RTLS market.

78.     For example, the Former Employees can approach a key account, highlight issues they know about from their time working at CenTrak, and offer Strongline as a timely and seemingly "better' alternative.

79.     Similarly, their knowledge of CenTrak's strategic partnerships would enable them to exert pressure on these partners and shut CenTrak out of future use cases.

80.     In sum, it has become clear that Commure has hired the Former Employees solely to exploit the confidential sales information they possess from their time at CenTrak, and then directed the Former Employees to use that information so Commure could target some of CenTrak's biggest customers.

81.     On May 30, 2025, the undersigned counsel for CenTrak issued a final litigation warning with a demand for assurances from Commure and the Former Employees that the Agreement was not being violated. *See* true and correct copy of the May 30, 2025, letter, attached hereto as Exhibit "F".

82.     Unfortunately, neither CenTrak nor its counsel have received any response from Commure or the Former Employees related to that letter, forcing CenTrak to commence this

litigation to protect its contractual rights, customer relationships, confidential information and trade secrets.

83.     Even worse, CenTrak's continued investigation into this dispute has revealed at least three separate accounts – Customer A, Customer B, and Customer C[4] – which have lost opportunities caused by Defendants' actions, which total over $2 million, as well as other accounts in which CenTrak and Commure continue to compete for business, creating even more potential for significant harm.

## COUNT I – INJUNCTIVE RELIEF

### (against all Defendants)

84.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

85.     The Former Employees' conduct constitutes a breach of contract and a violation of the PUTSA and DTSA as described below.

86.     Commure's conduct constitutes an impermissible interference with contractual relations, as well as a violation of the Pennsylvania Uniform Trade Secrets and Defend Trade Secrets Act as described below.

87.     By virtue of the foregoing allegations, CenTrak has demonstrated a likelihood of success on the merits.

88.     CenTrak is entitled to injunctive relief against Defendants because there will be irreparable harm to CenTrak should Defendants continue to use CenTrak's confidential information to improperly compete in the RTLS market. CenTrak will be irreparably harmed by Defendants' disclosure of CenTrak's trade secrets, customer lists, or other confidential

---

[4] For obvious reasons, CenTrak does not explicitly identify its customers in public filings.

information and the loss of confidentiality of client records and financial information, loss of trust of clients, loss of market share, loss of goodwill, and loss of business reputation.

89.     The losses suffered by CenTrak as a result of Defendants' conduct cannot be fully or adequately compensated in money damages, and CenTrak does not have an adequate remedy as a matter of law.

90.     Greater injury will be inflicted upon CenTrak and its customers by the denial of relief than would be inflicted upon Defendants by the granting of such relief.

91.     Granting such relief will be in the public's interest.

92.     In sum, as the direct and proximate result of Defendants' improper and unlawful conduct, CenTrak has suffered, and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm and irreparable injury. Because CenTrak's remedy at law is inadequate, it seeks, in addition to monetary damages, injunctive relief to enforce the Employee Agreements and to recover and protect its confidential, proprietary, and trade secret information, amongst other legitimate business interests.

## COUNT II – BREACH OF CONTRACT

### (against Peter Rodrigues, Todd Stewart, Christine Sei, Anthony Fierro)

93.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

94.     Section 2 of the Agreement prohibited the Former Employees, for one year following the termination of their employment from CenTrak, from:

        a.   Directly or indirectly competing with the business of CenTrak;

        b.   Soliciting any current or prospective customers of CenTrak; and

        c.   Soliciting any employees or agents of CenTrak.

*See* Exhibit A, at §2; *see also* Exhibits B and C.

95.     Upon information and belief, each of the Former Employees have breached that provision of the Agreement by misappropriating the confidential commercial sales information they learned through their work at CenTrak to improperly assist Commure in competing in the RTLS market, as described in full above.

96.     As a direct and proximate result of the Former Employees' breaches of the Agreement, CenTrak has suffered and will continue to suffer competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, and pre- and post-judgment interest, attorneys' fees, and other costs allowed by law.

## COUNT III – BREACH OF DUTY OF LOYALTY

### (against Peter Rodrigues, Todd Stewart, Christine Sei, Anthony Fierro)

97.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

98.     The Former Employees owed CenTrak a duty of loyalty during the course of their employment, which, pursuant to Section 2 of the Agreement, extended to one year past the termination of their employment.

99.     The Former Employees each breached their duty of loyalty during the course of their employment and afterwards for all of the aforesaid acts described above, and more specifically, their efforts to divert existing CenTrak clients and business opportunities to Commure through the improper use of CenTrak's confidential sales information.

100.     As a direct and proximate result of the Former Employees' conduct, CenTrak has suffered and will continue to suffer irreparable harm and damages in an amount to be determined

at trial, which damages are ongoing and continue unabated at the time of the filing of this Complaint.

## COUNT IV – INTERFERENCE WITH CONTRACTUAL RELATIONS

### (against Commure, Inc.)

101.    The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

102.    CenTrak had a contractual relationship with each of the Former Employees, as set forth in the Agreement.

103.    Through their discussions with the Former Employees and correspondence from CenTrak's counsel dated January 7, 2025, January 24, 2025, and May 30, 2025, Commure was well aware of the Agreement and its provisions as they related to each of the Former Employees.

104.    Despite this knowledge, Commure intentionally, improperly, and willfully induced the Former Employees to breach the terms of the Agreement, with malicious intent, by directing them to target known CenTrak customers and Commure's behalf so that those customers could be stolen from CenTrak to build Commure's market share in the RTLS market.

105.    These acts were calculated to, and did in fact, cause irreparable harm to CenTrak's business and competitive position in its industry.

106.    Commure's intentional, improper, and willful acts were undertaken with the purpose of inducing, and did in fact induce, the Former Employees to breach the terms of the Agreement.

107.    There was no lawful justification or justifiable cause of Commure's intentional, improper, and willful acts.

108.     As a direct and proximate result of Commure's intentional, improper, and unlawful conduct, CenTrak has suffered, and if Commure's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, and pre- and post-judgment interest, attorneys' fees, and other costs allowed by law.

### COUNT V – TRADE SECRETS MISAPPROPRIATION UNDER THE FEDERAL DEFEND TRADE SECRETS ACT

**(against all Defendants)**

109.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

110.     As set forth above, CenTrak has certain proprietary Confidential Information, as defined in the Agreement, that is critical to its success and competitive position in the RTLS market. This Confidential Information has been gathered and developed over CenTrak's years of operation and efforts in establishing client relationships, and it provides CenTrak with a clear competitive advantage in the marketplace.

111.     The Confidential Information constitutes trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, because it is not generally known to, and not readily ascertainable by proper means by, other people who can obtain economic value from its disclosure or use and is subject to reasonable efforts to maintain its secrecy.

112.     Specifically, CenTrak limits access to the Confidential Information to only employees who need to know the specified information and uses the terms of the Agreement to ensure that the Confidential Information is safe from unauthorized use, acquisition, and/or disclosure, and to stop it from becoming publicly available.

113.     As described above, Defendants have misappropriated CenTrak's trade secrets through their use of the Confidential Information to improperly compete in the RTLS space.

114.     The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other individuals who can obtain economic value from its disclosure or use.

115.     Over the years, CenTrak has derived economic value from the Confidential Information as reflected by its client base and strong position in the RTLS market.

116.     CenTrak's Confidential Information is not generally known outside of its organization, cannot be easily recreated by competitors, and would provide significant economic benefit to its competitors.

117.     Through the actions described above, Defendants have willfully and maliciously misappropriated CenTrak's trade secrets, and they have refused to acknowledge CenTrak's attempts at resolving this dispute without Court intervention.

118.     As a direct and proximate result of Defendants' improper, unlawful, willful, and malicious conduct, CenTrak has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, in addition to pre- and post-judgment interest, attorneys' fees, and other costs as allowed by law.

### COUNT VI – TRADE SECRET MISAPPROPRIATION UNDER THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT

**(against all Defendants)**

119.     The allegations contained in the preceding and following paragraphs are incorporated herein by reference with the same force and effect as though set forth in full below.

120.    As set forth above, CenTrak has certain Confidential Information, as defined in the Agreement, that is critical to its success and competitive position in the RTLS market.

121.    This Confidential Information has been gathered and developed over CenTrak's years of operation and provides CenTrak with a competitive advantage in the marketplace.

122.    The Confidential Information constitutes valid trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa.C.S.A. § 5301, *et seq.*, because it is not generally known to, and not readily ascertainable by proper means by, other people who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

123.    Specifically, CenTrak limits access to the Confidential Information to only employees who need to know the specified information, and uses the terms of the Agreement to ensure that the Confidential Information is safe from unauthorized use, acquisition, and/or disclosure, and to stop it from becoming publicly available.

124.    As described above, Defendants have misappropriated CenTrak's trade secrets through their use of the Confidential Information to improperly compete in the RTLS space.

125.    The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other individuals who can obtain economic value from its disclosure or use.

126.    Over the years, CenTrak has derived economic value from the Confidential Information as reflected by its client base and strong position in the RTLS market.

127.    CenTrak's Confidential Information is not generally known outside of its organization, cannot be easily recreated by competitors, and would provide significant economic benefit to its competitors.

128.    Through the actions described above, Defendants have willfully and maliciously misappropriated CenTrak's trade secrets, and they have refused to acknowledge CenTrak's attempts at resolving this dispute without Court intervention.

129.    As a direct and proximate result of Defendants' improper, unlawful, willful, and malicious conduct, CenTrak has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, in addition to pre- and post-judgment interest, attorneys' fees, and other costs as allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, CenTrak, demands judgment against Defendants, Commure, Rodrigues, Stewart, Sei, and Fierro, and seeks the following relief:

a.    That the Court enter an Order granting CenTrak a preliminary and permanent injunction enforcing the Former Employees' Agreements;

b.    That the Court enter an Order granting CenTrak a preliminary and permanent injunction prohibiting Defendants from retaining, disclosing, or further utilizing CenTrak's trade secrets and other Confidential Information;

c.    That the Court enter a Permanent Injunction with terms continuing the preliminary relief sought;

d.    That, in addition to the injunctive relief sought, the Court enter judgment in favor of CenTrak and against Defendants for damages in an amount in excess of $50,000, the total of which to be proven at trial;

e.    That the Court award CenTrak reasonable attorneys' fees incurred in connection with the allegations set forth herein and the costs of these

proceedings, as allowed by the Agreement, PUTSA, DTSA, and/or any other applicable law;

f.   That the Court award to CenTrak pre- and post-judgment interest against Defendants on all sums awarded pursuant hereto; and

g.   That the Court award CenTrak such other and further relief as it deems just and proper.

Respectfully Submitted,

**SPECTOR GADON ROSEN VINCI, P.C.**

By: */s/ Zachary C. Glaser*
        Zachary C. Glaser, Esq.
        Adam A. Filbert, Esq.
        One Logan Square, Suite 1800
        130 N. 18th Street
        Philadelphia, PA 19103
        215.241.8833
        215.241.8844 (fax)
        zglaser@sgrvlaw.com / afilbert@sgrvlaw.com
        *Counsel for Plaintiff, CenTrak, Inc.*

Date: August 13, 2025